In re:

VISIONS GOLF, LLC                              Case No. 8:11-bk-08840-KRM
d/b/a WALDEN LAKE GOLF AND                     Chapter 11
COUNTRY CLUB,

      Debtor.

_____/

## DISCLOSURE STATEMENT

## ARTICLE I
## INTRODUCTION

VISIONS GOLF, LLC d/b/a WALDEN LAKE GOLF AND COUNTRY CLUB, the Debtor in the above styled Chapter 11 case, hereby provides this Disclosure Statement ("Disclosure Statement") to all of its known creditors in order to fully disclose that information deemed by the Debtor to be material, important, and necessary for its creditors to arrive at a reasonably informed decision in exercising their right to vote for acceptance of the Debtor's Chapter 11 Plan (hereafter the "Plan").

The United States Bankruptcy Code provides, as a general rule, that in order for a Chapter 11 Plan to be accepted, each class of the claims must accept the Plan. A class of creditors whose rights are impaired and altered under the Plan are deemed to have accepted the Plan if two-thirds (2/3) in dollar amounts and one-half (1/2) in number of those creditors in that class holding allowed claims and who file a ballot vote for the Plan. A class of claims which is not impaired under the Plan is deemed to have accepted the Plan and need not vote.

## **Cramdown/Absolute Priority Rule/New Value Exception**

In the event the Plan is not accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the creditors voting in any impaired class, the Debtor, under Section 1129(b) of the Bankruptcy Code, may request the Court to confirm the Plan anyway. The Court in such a case will confirm the Plan if all requirements for confirmation set forth in the Bankruptcy Code, except acceptance by one or more classes of creditors, are met and the Court finds the Plan to be "fair and equitable" to the non-accepting class(es). This is commonly called a "cramdown." In the event the Debtor is unable to obtain the vote of its unsecured creditor class, the Debtor may be required to overcome an objection based on the "absolute priority rule." The absolute priority rule generally provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under a plan. If there is a "cramdown," the equity owners of the Debtor may be required to have an auction of their equity interest in the Debtor or they would have to contribute "new value" (purchase their equity for an amount the Court determines is sufficient). Any purchaser of the Debtor's equity interest would be bound to comply with the confirmed Plan as the equity owner and would be subject to comply with Florida law, including but not limited to the fiduciary duty owed to creditors by the equity owner of the Debtor. Failure to comply with the terms of the Plan as confirmed by the Court or any effort by a purchaser of the Debtor's equity interest to advance its equity interest over the interest of the Debtor's creditors would likely constitute a breach of fiduciary duty. The Plan specifically provides for the Bankrutpcy Court to retain jurisdiction to enforce all Plan provisions including any breaches of fiduciary duty by a purchaser of the Debtor's equity interest. If the Plan is not accepted by all classes, the Debtor may be liquidated under Chapter 7 of the Bankruptcy Code. In that event, the Debtor's assets

would be liquidated and distributed to the creditors after the payment of all costs of administration and the payment of priority claims.

The cost of distributing the Plan and this Disclosure Statement, as well as the costs, if any, of soliciting acceptances, will be borne by the Debtor as an Administrative Expense. In addition, the Debtor has retained the services of the law firm of Morse & Gomez, P.A., 119 South Dakota Avenue, Tampa, Florida 33606, in connection with the preparation of the Plan. The payment of fees, however, is contingent upon approval by the Bankruptcy Court after notice is given to all creditors and other interested parties.

**NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY AS TO ITS FUTURE BUSINESS OPERATIONS, VALUE OF PROPERTY, OR THE VALUE OF ANY PROMISSORY NOTES, IF ANY, TO BE ISSUED UNDER THE PLAN) ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR ACTION AS MAY BE DEEMED APPROPRIATE.**

**THE DEBTOR'S PLAN, IF CONFIRMED, WILL BE A LEGALLY BINDING DOCUMENT. CREDITORS AND PARTIES IN INTEREST SHOULD CONSULT WITH COUNSEL TO DETERMINE WHAT EFFECT, IF ANY, THE DEBTOR'S PLAN WILL HAVE ON THEM.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AN AUDIT. THE RECORDS KEPT BY THE DEBTOR ARE DEPENDENT UPON ACCOUNTING PERFORMED BY OTHERS. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S PRINCIPALS, HOWEVER, FOR THE FOREGOING REASONS, AS WELL AS BECAUSE OF THE COMPLEXITY OF THE DEBTOR'S FINANCIAL MATTERS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN TO BE WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.**

## ARTICLE II
## BACKGROUND OF DEBTOR

The Debtor was formed in May of 2006 as a Florida limited liability company. Stephen J. Mercer is the Debtor's Managing Member as well as the General Manager and owns 25% membership interest in the Debtor. The Debtor's remaining members and their percentage of ownership interests are as follows: (1) Earl Brantley – 7%; (2) Larry Williams – 25%; (3) Douglas Cowell – 15%; (4) Tavia Cowell – 15%; (5) Dale Missildine – 8%; and (6) Timothy Bussell – 5%.

The Debtor's operation is located at 2001 Clubhouse Drive, Plant City, Florida. The Debtor owns the property which consists of two (2) 18-hole championship golf courses and a country club owned and operated by the Debtor under the d/b/a of Walden Lake Golf & Country Club. The Debtor's facilities and other sources of revenue also include a fully stocked golf shop, a snack bar, plus a full service bar, a comprehensive practice facility featuring a driving range and practice greens. The clubhouse is a 27,000 square foot facility where the Debtor hosts an array of events, including without limitation, weddings, receptions, banquets, and reunions. The

Debtor also offers tennis, swim and fitness facilities and sells golf, tennis, swim and social memberships.

## Events Precipitating the Chapter 11 Filing[1]

After the Debtor was formed, on or about May 8, 2006, an Agreement for the Purchase and Sale was entered into by and between The Fairways Group, L.P. ("Fairways"), as seller and the Debtor as Purchaser for the purchase of the Walden Lake Golf & Country Club. On or about August 17, 2006, the closing of the sale occurred.

Prior to the Debtor acquiring ownership of the Walden Lake Golf & Country Club, William K. Kagel ("Kagel") was employed by Fairways. Kagel's employment continued with the Debtor as successor owner of the Walden Lake Golf & Country Club. On or about December 2004, Kagel opened a savings account at Midflorida Federal Credit Union "Midflorida") in the name of "William K. Kagel" with a comment: "Patricia Kagel Liver Trans/Golf Tournament" ("Midflorida Account"). Thereafter, both during the ownership by Fairways and after the sale to the Debtor, Kagel deposited checks made payable to "Walden Lake Golf & Country Club" into the Midflorida Account, his own personal savings account that was opened and maintained at Midflorida.

Beginning on or about August 2006 and continuing through May 2008, Kagel converted for his own use and benefit monies that were the property of the Debtor in an amount exceeding $100,000.00. The checks Kagel received from the public were made payable to the Walden Lake Golf & Country Club and were not endorsed by the Debtor.

Based upon the embezzlement by Kagel, on or about September 23, 2008, the Debtor filed a lawsuit against Kagel and Midflorida, in the Thirteenth Judicial Circuit in and for

---

[1] The Debtor has also filed a Chapter 11 Case Management Summary (Doc. No. 3) which contains additional background information. The Case Management Summary is incorporated herein by reference and provides additional factual background.

Hillsborough County, Florida, Case No. 08-CA-019531. Thereafter, on or about February 26, 2009, the case was transferred to the Tenth Judicial Circuit in and for Polk County, Florida and assigned Case No. 09-CA-002074. On or about December 11, 2009, the Debtor amended its complaint to include counts against Fairways for conversion and conspiracy ("Kagel Litigation"). The Debtor successfully negotiated a compromised with all parties, except Mr. Kagel, relating to the Kagel Litigation. As a result, on August 31, 2011 the Debtor filed its Motion to Compromise the Kagel Litigation (Doc. No. 111) ("Kagel Litigation Compromise"). The Debtor has a restitution order that obligates Mr. Kagel to pay the Debtor $132,967.00 pursuant to the Final Judgment of Restitution. Mr. Kagel is currently incarcerated as a result of the embezzlement against the Debtor.

After the Debtor's purchase of its current facilities, operating revenues and profits initially reflected increases; but the increases were stymied by the downturn in the economy. In addition to the downturn in the economy which began in 2008, the unusual weather conditions over the past two (2) years have greatly affected the Debtor's revenue. For instance, the 2009 winter was unusually cold and the 2010 year had an extremely hot summer, an extremely dry fall and an unusually cold winter. The unusually severe weather conditions resulted in a very low turnout on the golf course, which is a main source of the Debtor's revenue.

The decline of both national and local economic conditions has negatively affected the Debtor's revenue not only in terms of membership totals but also revenue generated through the use of the Debtor's golf course and related facilities. Plant City, Florida has been significantly affected by the downturn in the economy and more particularly, the decrease in construction and development of real estate. Many of the Debtor's members and former members have and/or had careers related to the real estate industry, and the discontinuance of many real estate

developments and construction projects has been reflected considerably in the Debtor's lost revenues.

On or about January 28, 2011, Zions First National Bank ("Zions") filed a foreclosure complaint which contained a count seeking the appointment of a receiver ("Foreclosure Action"). During the pendency of the Chapter 11, the Debtor successfully obtained a reasonable restructuring of the Zions loan as set forth in the Debtor's Motion to Compromise Controversy by and between the Debtor and Zions (Doc. No. 106) ("Zions Compromise"). Both the Kagel Litigation Compromise (Doc. No. 111) and the Zions Compromise (Doc. No. 106) are incorporated into the Debtor's Plan as part of the Debtor's reorganization. To date, the Court has not approved the Motions to Compromise as of the filing of this Disclosure Statement.

## Additional Events that Affected Initial Business Plan

At the time the Debtor initially purchased the Walden Lake Golf & Country Club, projections indicated that operating revenues and profits would increase from the business operations. These projections were based partly on the anticipated increased membership that would was expected to result from the closing of another golf course in Plant City, the Debtor's only local competitor. Additionally, the Debtor leased the closed golf course in order to expand the Debtor's facilities, but the owner of the closed golf course cancelled the lease in order to facilitate clean-up of the property from a previous phosphate operation.

The economy and housing market were strong when the Debtor purchased its current operations. Consequently, the Debtor was considering the use of some of the property for community development. The Debtor anticipated that sales of the developed properties would have included golf memberships and other amenities such as free golf cars with any property purchase. By increasing the number of members and golfers residing in the community, the

Debtor's revenues would have increased. The Debtor foresaw the development as a means to generate additional capital that would result in the pay down of the Debtor's debt with the end-goal being achieving a debt-free business operation.

However, the community development was stalled because of the declining economy, and most particularly the housing market. In addition, development plans were stalled due to a "no rezoning" restriction placed on the property by the previous owner and developer WCI Communities, Inc. ("WCI"). The restriction prevented any rezoning for a period of twenty-five (25) years commencing in 1990, or fifteen (15) years after the year 2000, the date the last lot was sold in the development. Consequently, the restriction would remain in place under either circumstance until the year 2015.

In 2008, the Debtor filed a complaint against WCI and the Walden Lake Community Association, Inc. ("HOA") seeking to have the restriction removed to enable the Debtor to possibly move forward with its development plans. The complaint was filed in the Circuit Court of the Thirteenth Judicial Circuit, Hillsborough County, Florida and assigned Case No. 08-CA-024466. However, before the Circuit Court could consider the relief requested, the Debtor learned that WCI filed bankruptcy in the U.S. Bankruptcy Court in the District of Delaware. The bankruptcy was assigned Case No. 08-11643-KJC.

As the economy continues to stabilize and the housing market recovers, the community development could remain a viable business plan for expansion of operations and increasing revenues and profits. By its own terms, the restriction will no longer apply in 2015, and the Debtor will revisit the community development plan as that deadline approaches to determine if such development would be advantageous to the Debtor and its creditors.

**Debtor's Post-Petition Efforts to Reorganize**

During the course of the Chapter 11 case the Debtor has taken several steps to reorganize by reducing its debt service.

On May 25, 2011 the Debtor filed its Motion to Value Pursuant to 11 U.S.C. Section 506, Determine Secured Status of Zions First National Bank, Reliance Bank and the United States Business Administration and All Other Junior Lien Holders and to Strip Liens (Doc. No. 40). Since the filing of this Motion, the Debtor has engaged in extensive settlement discussions with Zions as to the value of the collateral as well as the treatment of Zions' claim under the Debtor's Plan. The Debtor and Zions finally and fully resolved their disputes as to the valuation of the collateral and the treatment of Zions' claim. The parties agree that the value of the collateral is $2,327,025.03 and that Zions' claim shall be treated as fully secured. The claim of Reliance Bank and the SBA shall be treated as wholly unsecured. In fact, Reliance Bank filed a Proof of Claim No. 32 in the amount of $383,422.31 indicating that its claim is unsecured.

On August 24, 2011, the Debtor filed its Motion to Approve Compromise of Controversy by and between the Debtor and Zions First National Bank (Doc. No. 106). The Debtor anticipates that the Court will approve the compromise shortly. The agreed treatment of Zions' claim is outlined below. (Please see §4.6 herein).

On June 7, 2011, the Debtor filed its Motion to Value and Determine Secured Status of Western Finance & Lease, Inc. ("Western Finance") Pursuant to 11 U.S.C. Section 506 (Doc. No. 46). After numerous settlement discussions, Western Finance and the Debtor fully resolved their dispute as to the value of collateral. On July 20, 2011 the Debtor filed its Motion to Approve Compromise of Controversy by and between the Debtor and Western Finance (Doc. No. 85). Pursuant to a stipulation between the parties agreed that the value of Western Finance's

collateral is $10,956.03.  Accordingly, Western Finance is fully secured will have an allowed secured claim in the amount of $10,956.03.  The agreed treatment of Western Finance's claim is outlined below.  (Please see §4.6 herein).

Also on June 7, 2011, the Debtor filed its Motion to Value and Determine Secured Status of De Lage Landen Financial Services, Inc. ("De Lage") Pursuant to 11 U.S.C. Section 506. After conducting a hearing on the De Lage Motion to Value, the Court entered an Order Granting the Motion on July 8, 2011 (Doc. No. 76).  Pursuant to the Order on the De Lage Motion to Value, the Court determined that the value of De Lage collateral is $3,000.00. Accordingly, De Lage would have an allowed secured claim in the amount of $3,000.00, and any remaining balance shall be treated as an allowed general unsecured claim.  The treatment of De Lage's claim is outlined below.  (Please see §4.6 herein).

On July 13, 2001, the Debtor filed its Motion to Approve a Pro Shop Agreement by and between the Debtor and Steve's World of Golf, Inc. d/b/a Steve's World of Golf (Doc. No. 80). Under the terms of the Pro Shop Agreement, Steve's World of Golf ("SWOG") will lease the Debtor's Pro Shop, and operate the Pro Shop under SWOG's business name, for a set rental fee of $1.00 per month to be paid to the Debtor.  In addition, Debtor will receive commission on any of SWOG's merchandise sold in the Pro Shop as set forth in the Agreement.  Operation of the Pro Shop by SWOG will relieve the Debtor of this task so that the Debtor's attention and focus can be directed toward its reorganization efforts and create an additional income stream.  On August 11, 2011 the Court entered its Order Approving the Pro Shop Agreement authorizing the Debtor to enter into such Agreement (Doc. No. 91).

The Debtor was successful in settling the Kagel Litigation with Midflorida Federal Credit Union ("Midflorida") and The Fairways Group of Delaware Limited Partnership ("Fairways").

Pursuant to the Settlement Agreement, the Debtor will recover a total of $125,000.00, with Midflorida paying the Debtor $102,000 and Fairways paying $23,000.00 ("Recovered Funds"). A key component of this compromise is the Debtor's requirement to utilize the Recovered Funds to fund its reorganization effort. For instance, a portion of the Recovered Funds shall be earmarked towards paying certain Plan obligations including up to four (4) months worth of monthly payments the Debtor is obligated to pay to Zions First National Bank upon Plan confirmation. The Debtor will not prepay the four (4) months worth of payments, but earmark and place in escrow the four (4) months worth of payments which will be released and paid as each monthly payment due to Zions comes due. The balance of the funds will be utilized by the Debtor to fund its reorganization plan.

On August 31, 2011, the Debtor filed its Motion to Approve Compromise by and between the Debtor, Midflorida and Fairways seeing approval of the Settlement Agreement between them (Doc. No. 111).

Additionally, the Debtor recently made a presentation to the Walden Lakes Homeowners Association ("WLHOA") board requesting a $200 annual assessment for each household in exchange for the use of the Debtor's facilities, including but not limited to the Debtor's pool, fitness equipment, tennis courts, and hiking trails, etc. plus capital improvements (cart paths, turf care, etc). The WLHOA board agreed to put it to a community vote in November, 2011. If the community votes in favor of this new annual assessment the funds will become available to the Debtor in 2012 and each year thereafter. If passed, the WLHOA assessment will provide the Debtor with additional revenue of approximately $500,000 per year.

As the economy stabilizes and improves, the Debtor anticipates restructuring its debt and emerging from Chapter 11 as a viable going concern.

# ARTICLE III
## AVOIDANCE ACTIONS/LITIGATION

As stated above, based upon the embezzlement by William K. Kagel ("Kagel") on or about September 23, 2008, the Debtor filed a lawsuit against Kagel and Midflorida Federal Credit Union ("Midflorida"), in the Thirteenth Judicial Circuit in and for Hillsborough County, Florida, Case No. 08-CA-019531. Thereafter, on or about February 26, 2009, the case was transferred to the Tenth Judicial Circuit in and for Polk County, Florida and assigned Case No. 09-CA-002074. On or about December 11, 2009, the Debtor amended its complaint to include counts against The Fairways Group of Delaware Limited Partnership ("Fairways") for conversion and conspiracy ("Kagel Litigation").

Post-petition, the Debtor was successful in negotiating a settlement of the Kagel Litigation with Midflorida and Fairways. Kagel is not a party to the Settlement Agreement and is an excluded from the terms of the settlement.

Pursuant to the Settlement Agreement, the Debtor shall recover a total of $125,000.00, with Midflorida paying $102,000 and Fairways paying $23,000.00 ("Recovered Funds") within fifteen (15) calendar days of the date of any Order approving this compromise and/or confirmed Chapter 11 plan and shall be held in trust by either (or both) payee(s) until the Kagel Litigation against both Midflorida and Fairways is finally dismissed with prejudice. The Recovered Funds will be paid to Debtor's counsel's trust account, and will be distributed by the Debtor in accordance with the order of the Bankruptcy Court. The Parties agree to hold all related settlement documents and releases in trust until such time as there is entry of an Order by the Bankruptcy Court authorizing and approving this Settlement Agreement, an Order is entered dismissing the Kagel Litigation with prejudice against Midflorida and Fairways, and there is full performance of the terms and conditions of the Settlement Agreement.

Upon receipt of a fully executed Settlement Agreement, the Debtor shall file a Joint Motion for Dismissal of the Kagel Litigation against Midflorida and Fairways with Prejudice or Joint Motion Dropping Midflorida and Fairways with Prejudice, in a form suitable for filing with the court.

Other than settlement of the Kagel Litigation as stated above, the Debtor has not initiated any preference, fraudulent transfer or other actions under Subchapter III of Chapter 5 of the Bankruptcy Code. The Debtor has analyzed the possibility of avoiding and recovering, as Debtor in possession, preferential or fraudulent transfers pursuant to Sections 544, 547, 548, and 550 of the Bankruptcy Code and applicable non-bankruptcy law. The Debtor is unaware of any preferential or fraudulent transfers either intentional or constructive, subject to avoidance and recovery by it as a Debtor in possession.

**ARTICLE IV**
**CLASSIFICATION AND TREATMENT OF**
**CLAIMS AND INTERESTS**

4.1     Classification of Claims and Interests.

(a)     Classification.

(1)     General. Article II of the Plan sets forth the designation of Classes of Claims and Interests. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of the Class and is classified in a different Class to the extent the Claim or Interest qualifies within the description of that different Class.

(2)     Unclassified Claims. In accordance with §1123(a) of the Bankruptcy Code a Plan must place into classes all of the claims against an interest in the Debtor, the only exceptions being Administrative Claims, Involuntary Gap Claims (if any) and Priority Tax Claims, none of which vote on the Plan. These claims, which are excluded from classification, are treated elsewhere in Chapter 11.

4.2 <u>Classes</u>. For purposes of the Plan, the Claims against, or Interests in, the Debtor are grouped in the following Classes in accordance with §1122(a) of the Bankruptcy Code:

1. Class 1 (Impaired) consists of the secured claim of SunTrust Bank ("SunTrust") whose secured claim totals approximately $98,951.87, which debt appears to be secured by a mortgage lien and UCC Financing Statement filed with the Florida Secured Transaction Registry on September 8, 2006 against the Debtor's accounts receivable, cash, inventory, furniture, fixtures and equipment ("Personal Property") (Accounts receivable and cash are hereinafter referred to as "cash collateral"). SunTrust appears to have a first priority lien on, including without limitation, the Debtor's cash collateral. See treatment in §4.6 herein.

2. Class 2 (Impaired) consists of the secured claim of Zions First National Bank ("Zions") in the approximate amount of $2,327,025.03. The debt appears to be secured by a first mortgage on the Debtor's real estate and Personal Property, including without limitation, the Debtor's accounts receivable, cash, inventory, furniture, fixtures and equipment ("First Mortgage") (Accounts receivable and cash are hereinafter referred to as "cash collateral"). Zions appears to have perfected its security interest in the Debtor's real estate and Personal Property by virtue of a mortgage lien and UCC Financing Statement filed on June 2, 2008 with the Florida Secured Transaction Registry. Zions' lien on cash collateral appears to be in a second priority lien behind SunTrust. See treatment in §4.6 herein.

3. Class 3 (Impaired) consists of the secured claim of the Hillsborough County Tax Collector who is owed a total of approximately $61,553.92, which is comprised of approximately $57,408.64 for 2010 real property taxes and approximately $4,145.28 for 2010 tangible property taxes. The Debtor reserves the right to make a down payment, or other

prepayment, once the Recovered Funds relating to the Kagel Litigation are paid to the Debtor. See treatment in §4.6 herein.

4.      Class 4 (Impaired) consists of the secured claim of De Lage Landen Financial Services, Inc. in the amount of $13,704.53 which debt appears to be secured pursuant to a capital lease for the purchase of an Oce Imagistics office print center (the "Collateral"). On June 7, 2011 the Debtor filed its Motion to Value and Determine Secured Status of De Lage Landen Financial Services, Inc. Pursuant to 11 U.S.C. Section 506 asserting that the value of the Collateral is $3,000.00. On July 8, 2011, the Court entered an order granting the Debtor's Motion (Doc. No. 76). Pursuant to the Court's Order, or docket number 76, De Lage shall have an allowed secured claim in the amount of $3,000.00 and any remaining balance of De Lage's claim shall be treated as an allowed general unsecured creditor. See treatment in §4.6 herein.

5.      Class 5 (Impaired) consists of the secured claim of Western Finance & Lease, Inc. ("Western Finance") in the total amount of $10,956.03 which debt appears to be secured pursuant to certain capital leases for the purchase of various golf course maintenance equipment (the "Collateral"). On June 7, 2011 the Debtor filed Motion to Value and Determine Secured Status of Western Finance & Lease, Inc. Pursuant to 11 U.S.C. Section 506 asserting that the value of the Collateral is $5,000.00. On or about July 20, 2011 the Debtor and Western Finance entered into a Stipulation Resolving Debtor's Motion to Value Collateral of Western Finance and for Adequate Protection agreeing that value of the Collateral is $10,956.03 and that Western Finance shall have an allowed fully secured claim. The Debtor filed a Motion to Approve the Compromise with the Court and anticipates that the court will enter an order approving the compromise shortly. See treatment in §4.6 herein.

6.      Class 6 (Impaired) consists of the claim of the Internal Revenue Service ("IRS") who is owed a total of approximately $115,780.69, which is comprised of a secured component in the approximate amount of $104,906.39 and a priority unsecured component in the approximate amount of $10,874.30 for 941 employment taxes owed for the 2009 tax periods and any proper penalties and interest related thereto.  The IRS recorded a Notice of Federal Tax Lien in the Public Records of Hillsborough County, Florida on August 26, 2010.  The Debtor reserves the right to make a down payment, or other prepayment, once the Recovered Funds relating to the Kagel Litigation are paid to the Debtor.  See treatment in §4.6 herein.

7.      Class 7 (Impaired) consists of the priority claim of the Florida Department of Revenue ("FDOR") who is allegedly owed a total of approximately $29,958.46, which is comprised of (a) the priority claim of $5,210.55 for February and March, 2011 unemployment taxes and (b) the priority claim of $24,757.91 for July, 2007 sales and use taxes and any proper penalties and interest related thereto.  The Debtor reserves the right to make a down payment, or other prepayment, once the Recovered Funds relating to the Kagel Litigation are paid to the Debtor.  See treatment in §4.6 herein.

8.      Class 8 (Impaired) consists of the claims of General Unsecured Creditors. The Debtor estimates that the total amount due to Class 8 claimants is approximately $1,974,336.01, non-inclusive of any disputed claims. The Debtor reserves the right to make a down payment, or other prepayment, once the Recovered Funds relating to the Kagel Litigation are paid to the Debtor.  See treatment in §4.6 herein.

9.      Class 9 (Impaired) consists of the claims of the individuals that entered into Lifetime Membership Agreements with the Debtor's predecessor in interest, The Fairways Group of Delaware, LP ("Fairways").  The Lifetime Membership Agreements were executed by

twelve (12) golf club members between November 10, 1998 and December 31, 2003. The individual golf club members each paid consideration to Fairways for a lifetime membership for the unlimited use and enjoyment of the amenities of the Debtor. The Agreements give the golf club members complete and unlimited access to the Debtor's amenities at no additional annual fee. The Agreements contain a buy-out provision at fifty percent of the amount of the original consideration paid to Fairways. However the Debtor received no consideration for the Agreements in the Debtor's acquisition of Walden Lake Golf & Country Club. The Debtor asserts that the Agreements are burdensome to the estate and hamper the Debtor's resources and reorganization effort. The continuation of the Agreements would result in unnecessary waste of the Debtor's assets which could instead be devoted to the Debtor's Plan of Reorganization. The Debtor now seeks to reject the Lifetime Membership Agreements described herein pursuant to 11 U.S.C. §365. See treatment in §4.6 herein.

10.    Class 10 (Unimpaired) consists of the membership interest ("Equity Interest") of the Debtor which is held by the following individuals: (1) Earl Brantley – 7%; (2) Larry Williams – 25%; (3) Douglas Cowell – 15%; (4) Tavia Cowell – 15%; (5) Dale Missildine – 8%; (6) Timothy Bussell – 5%; (7) Stephen J. Mercer – 25%.   See treatment in §4.6 herein.

4.3    Classes of Claims Not Impaired by the Plan.   Administrative Claims are not impaired by the Plan. Under §1126(f) of the Bankruptcy Code, the holders of those Claims are presumed conclusively to have voted to accept the Plan and, therefore, the votes of those holders shall not be solicited. It is estimated that the estimated administrative fees and costs shall be approximately $30,000.00 (after payment of any interim fees).

4.4    Classes of Claims Impaired by the Plan.   The claims of classes 1, 2, 3, 4, 5, 6, 7, 8, and 9 are impaired under the Plan.

4.5    Classes of Claims Not Impaired by the Plan:    The claim of class 10 is not impaired under the Plan.

4.6    Treatment of Allowed Claims and Allowed Interests.

(a)    General.  The Allowed Claims and Allowed Interests, as classified in Article II of the Plan, shall be satisfied in the manner set forth in Article II of the Plan.  The treatment of, and the consideration to be received by, holders of Allowed Claims and holders of Allowed Interests pursuant to the Plan shall be in full satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims and Allowed Interests.  The following constitutes the treatment under the Plan of the Allowed Claims and Allowed Interests:

1.    Class 1 (Impaired) consists of the secured claim of SunTrust Bank ("SunTrust") whose secured claim totals approximately $98,951.87, which debt appears to be secured by a mortgage lien and UCC Financing Statement filed with the Florida Secured Transaction Registry on September 8, 2006 against the Debtor's accounts receivable, cash, inventory, furniture, fixtures and equipment ("Personal Property") (Accounts receivable and cash are hereinafter referred to as "cash collateral").  SunTrust appears to have a first priority lien on, including without limitation, the Debtor's cash collateral.

The Debtor will treat the Class 1 Claim as fully secured in the approximate amount of $98,951.87 (less adequate protection payments made that will be applied to reduce the principal balance).  The Debtor shall pay the secured claim of Class 1 by making sixty (60) equal monthly payments of principal and interest at 5.25% per annum amortized over twenty-five (25) years in the approximate monthly amount of $592.97 with the first payment to begin upon the Effective Date of the Plan.  The Debtor will receive a credit for all adequate protection payments made which will be applied to reduce the principal amount.  At the end of the 60-month period, the

Debtor shall either refinance Suntrust's claim, obtain an extension or make a final balloon payment satisfying SunTrust's secured claim in full satisfaction of the debt. The terms of the original note and security agreement shall remain in full force and effect except as modified herein.

2.      Class 2 (Impaired) consists of the secured claim of Zions First National Bank ("Zions") in the approximate amount of $2,327,025.03. The debt appears to be secured by a first mortgage on the Debtor's real estate and Personal Property, including without limitation, the Debtor's accounts receivable, cash, inventory, furniture, fixtures and equipment ("First Mortgage") (Accounts receivable and cash are hereinafter referred to as "cash collateral"). Zions has a perfected security interest in the Debtor's real estate and Personal Property by virtue of a mortgage lien and UCC Financing Statement filed on June 2, 2008 with the Florida Secured Transaction Registry. Zions' lien on cash collateral is in a second priority lien behind SunTrust.

Pursuant to the terms of the compromise with Zions, the value of the Debtor's real estate is $2,327,025.03 and the Debtor will treat the Class 2 Claim as fully secured in the amount of $2,327,025.03. The Debtor shall pay the Class 2 claim by making twelve (12) equal monthly payments of principal and interest at 6% per annum amortized over twenty-two (22) years in the approximate monthly amount of $15,895.31 with the first payment to begin September 1, 2011. Commencing September 1, 2012 and continuing for the following forty-six (46) months, Zions claim shall be paid with interest at the annual percentage rate of the U.S. Prime Rate, plus 2.25%, but in no event shall the interest rate paid on Zions' claim during this period exceed 10%. On the first day of the 60th month following the Effective Date, any remaining balance of Zions' claim shall be due in full. The terms of the original note and mortgage shall remain in full force and effect except as modified herein.

3.  Class 3 (Impaired) consists of the secured claim of the Hillsborough County Tax Collector who is owed a total of approximately $61,553.92, which is comprised of approximately $57,408.64 for 2010 real property taxes and approximately $4,145.28 for 2010 tangible property taxes. The amount owed for such taxes, or $61,553.92, together with interest thereon at the rate of eighteen percent (18%) per annum, will be paid in equal monthly installments of $1,563.07 for sixty (60) months beginning on the Effective Date of the Plan. The Debtor reserves the right to make a down payment, or other prepayment, once the Recovered Funds relating to the Kagel Litigation are paid to the Debtor.

4.  Class 4 (Impaired) consists of the secured claim of De Lage Landen Financial Services, Inc. ("De Lage") in the amount of $13,704.53 which debt appears to be secured pursuant to a capital lease for the purchase of  an Oce Imagistics office print center (the "Collateral"). On June 7, 2011 the Debtor filed its Motion to Value and Determine Secured Status of De Lage Landen Financial Services, Inc. Pursuant to 11 U.S.C. Section 506 asserting that the value of the Collateral is $3,000.00. On July 8, 2011, the Court entered an order granting the Debtor's Motion (Doc. No. 76). Pursuant to the Court's Order, or docket number 76, De Lage shall have an allowed secured claim in the amount of $3,000.00 and any remaining balance of De Lage's claim shall be treated as an allowed general unsecured creditor.

The Debtor shall pay the secured component of the claim of Class 4, or $3,000.00, shall be paid with interest at the rate of 5.25% per annum in equal monthly installments of $106.92 for thirty (30) months beginning on the Effective Date of the Plan.  The unsecured component of the claim of Class 4 will receive the same treatment as the Debtor's other unsecured creditors in Class 8.

5.     Class 5 (Impaired) consists of the secured claim of Western Finance & Lease, Inc. in the total amount of $10,956.03 which debt appears to be secured pursuant to certain capital leases for the purchase of various golf course maintenance equipment (the "Collateral").   On June 7, 2011 the Debtor filed Motion to Value and Determine Secured Status of Western Finance & Lease, Inc. Pursuant to 11 U.S.C. Section 506 asserting that the value of the Collateral is $5,000.00.  On or about July 20, 2011 the Debtor and Western Finance entered into a Stipulation Resolving Debtor's Motion to Value Collateral of Western Finance and for Adequate Protection ("Stipulation") agreeing that value of the Collateral is $10,956.03 and that Western Finance shall have an allowed fully secured claim.   The Debtor filed a Motion to Approve the Compromise with the Court and the Court approved the Compromise and on August 19, 2011 entered an Order Granting Motion to Compromise between Debtor and Western Finance & Lease Inc. (Doc. No. 102).

Pursuant to the Stipulation, Western Finance is entitled to include, as part of its claim, post-petition interest, costs, and fees accruing under the Contracts. As to attorney's fees, absent default under the terms of the Stipulation by the Debtor, Western Finance has agreed to limit its attorney's fees to $500.00.

Commencing September 30, 2011, the Debtor will begin making payments of $500.00 monthly to Western Finance as adequate protection on the secured claims of Western Finance. Said adequate protection payments will continue on the 30th day of each and every month, up to the date of confirmation of any plan of reorganization in the above entitled Chapter 11 case. In the event Debtor's plan is not confirmed by December 31, 2011, Debtor and Western Finance agree to increase the adequate protection payments so as to totally pay the secured claims of Western Finance, with interest and attorneys' fees (as limited in accord with paragraph 5 above),

over a 12-month period (in equal monthly installments), with said increased payments to begin on December 31, 2011.

After the application of adequate protection payments made by the Debtor, first to Western Finance's attorney's fees (as limited in accord with the paragraph above) and costs, then to accrued interest, and finally to principal, the debts due on the Contracts will be amortized over a 12-month period, commencing on the 30th day of the month following the date of confirmation of the plan and continuing on the 30th day of each and every month thereafter, until the remaining debt to Western Finance, which includes interest accruing on the Contracts at the agreed rate of 5.3% and attorney's fees and costs incurred by Western Finance (limited in accord with the paragraph above) is fully paid. As security, Western will retain its first-position properly perfected security interest in the Contract 002 and Contract 003 Collateral until the debt it is owed is fully paid.

Physical damage insurance coverage on the Contract 002 and Contract 003 Collateral, including collision and comprehensive coverages, naming Western Finance as lienholder or loss payee shall be maintained until the balance of the debt on Western Finance's secured claim is paid in full, or the Contract 002 and Contract 003 Collateral is surrendered to Western Finance.

In the event of any default under any of the terms of the stipulation or any plan confirmed in this case, the bankruptcy stay will automatically lift and terminate without further order of the Court so that Western Finance may foreclose against, recover, and dispose of the Contract 002 and Contract 003 Collateral, with the proceeds being applied first to the costs of recovery and disposition, and then to the debts due to Western Finance under the Contracts.

6.     Class 6 (Impaired) consists of the claim of the Internal Revenue Service ("IRS") who is owed a total of approximately $115,780.69, which is comprised of a secured component

in the approximate amount of $104,906.39 and a priority unsecured component in the approximate amount of $10,874.30 for 941 employment taxes owed for the 2009 tax periods and any proper penalties and interest related thereto. The IRS recorded a Notice of Federal Tax Lien in the Public Records of Hillsborough County, Florida on August 26, 2010. The amount owed for such taxes, or $115,780.69, together with interest thereon at the rate of four percent (4%) per annum, will be paid in equal monthly installments of $2,614.22 for forty-eight (48) months beginning on the Effective Date of the Plan. Payments to the IRS shall be applied and allocated consistent with a 50/50 ratio of trust fund to the total claim. That is, 50% of the monthly payment shall be allocated to the trust fund portion of the IRS claim and the remaining 50% shall be allocated however the IRS deems appropriate. The Debtor reserves the right to make a down payment, or other prepayment, once the Recovered Funds relating to the Kagel Litigation are paid to the Debtor.

7. Class 7 (Impaired) consists of the priority claim of the Florida Department of Revenue ("FDOR") who is allegedly owed a total of approximately $29,958.46, which is comprised of (a) the priority claim of $5,210.55 for February and March, 2011 unemployment taxes and (b) the priority claim of $24,757.91 for July, 2007 sales and use taxes and any proper penalties and interest related thereto.

The Debtor asserts that the amounts claimed by the FDOR are incorrect and anticipates filing objections to such claims. Once the claims have been determined either by agreement between the parties or by Court Order, the Debtor shall pay the allowed priority claims of Class 7, together with interest thereon at the rate of six percent (6%) per annum, in equal monthly installments for sixty (60) months beginning on the Effective Date of the Plan. The Debtor

reserves the right to make a down payment, or other prepayment, once the Recovered Funds relating to the Kagel Litigation are paid to the Debtor.

8.     Class 8 (Impaired) consists of the claims of General Unsecured Creditors.   The Debtor estimates that the total amount due to Class 8 claimants is approximately $1,974,336.01, non-inclusive of disputed claims, and includes $383,422.31 owed to Reliance and the SBA pursuant to Reliance's filed proof of claim.   The Debtor shall pay the allowed claims of unsecured creditors a total of $402,000.00, which is approximately 20% of the total allowed claims based on the Debtor's estimate, by making sixty (60) monthly payments beginning upon the Effective Date of the Plan as follows:  a) $2,000 per month for months one (1) through twelve (12); b) $5,000 per month for months thirteen (13) through twenty-four (24); c) $7,000 per month for months twenty-five (25) through thirty-six (36); d) $8,000 per month for months thirty-seven (37) through forty-eight (48); and e) $11,500 per month for months forty-nine (49) through sixty (60).   Each Class 8 claimant will receive a pro-rata share of the monthly payments as described herein based on the amount of its Allowed Claim.   The Debtor reserves the right to make a down payment, or other prepayment, once the Recovered Funds relating to the Kagel Litigation are paid to the Debtor.

In order to avoid the cost and inconvenience of issuing small denomination checks, any prorated quarterly payment that does not equal at least two hundred fifty ($250) dollars may be accrued and not paid until the prorated amount equals at least two hundred fifty ($250) dollars. Unsecured creditors will not receive a promissory note and no interest will accrue.  The terms of the Debtor's Plan will bind the parties and control the Debtor/creditor relationship between the parties.

9. Class 9 (Impaired) consists of the claims of the individuals that entered into Lifetime Membership Agreements with the Debtor's predecessor in interest, The Fairways Group of Delaware, LP ("Fairways"). The Lifetime Membership Agreements ("Agreements") were executed by twelve (12) golf club members between November 10, 1998 and December 31, 2003. The individual golf club members each paid consideration to Fairways for a lifetime membership for the unlimited use and enjoyment of the amenities of the Debtor. The Agreements give the golf club members complete and unlimited access to the Debtor's amenities at no additional annual fee. The Agreements contain a buy-out provision at fifty percent of the amount of the original consideration paid to Fairways. The Agreements are executory contracts and subject to rejection. The Debtor's Plan seeks to reject the contracts that do not accept a payment option provided for in the Plan pursuant to 11 U.S.C. § 365. The Debtor received no consideration for the Agreements in the Debtor's acquisition of Walden Lake Golf & Country Club. The Debtor asserts that the Agreements are burdensome to the estate and hamper the Debtor's resources and reorganization effort. The continuation of the Agreements would result in unnecessary waste of the Debtor's assets which could instead be devoted to the Debtor's Plan of Reorganization. The Debtor now seeks to reject the Lifetime Membership Agreements described herein pursuant to 11 USC § 365.

As a result of the Debtor's rejection of the Agreements, the Debtor proposes to pay the claims of Class 9 under two (2) different payment options available to the Class 9 Claimants choosing. The Debtor proposes the following payment options which the Claimants can chose how their claim shall be paid under a confirmed plan:

**Option No. 1:**

The Debtor proposes to pay a total of ten percent (10%) of the current contract value, plus five percent (5%) interest over five (5) years. For the continued use of the Debtor's facilities, the Class 9 Claimants shall immediately begin paying the current membership dues for whatever membership the Claimant wishes to obtain.

The following is the current value of the Agreements' buyout provisions listed by Claimant name:

| **Name** | **Current Value** | **Offer** |
| --- | --- | --- |
| Griffin | $30,000 | $3,000 paid over 60 months with 5% interest |
| Artalona | $12.500 | $1,250 paid over 60 months with 5% interest |
| Stone | $25,000 | $2,500 paid over 60 months with 5% interest |
| Kimbro | $12.000 | $1,200 paid over 60 months with 5% interest |
| Meyer | $25,000 | $2,500 paid over 60 months with 5% interest |
| Barterau | $25,000 | $2,500 paid over 60 months with 5% interest |
| Kurtz | $12.500 | $1,250 paid over 60 months with 5% interest |
| Russell | $30,334 | $3,033 paid over 60 months with 5% interest |
| Stiller | $25,000 | $2,500 paid over 60 months with 5% interest |
| Rodwell | $12,000 | $1,200 paid over 60 months with 5% interest |
| Eller | $14,500 | $1,450 paid over 60 months with 5% interest |
| Walden | $25,000 | $2,500 paid over 60 months with 5% interest |

**Option No. 2.**

Under this payment scenario, the Debtor proposes to reduce the current membership dues by fifty percent (50%) for the next three (3) years. For those Class 9 Claimants who have a full membership, which includes full use of the facility and golf cart fees, the amount of the current membership would then be between $4,000 & $5,000 annually. A fifty (50%) reduction would save the Claimants $6,000-$7,500 over the three (3) year period. This is a significant savings over the Option 1 scenario which would be realized in a three (3) year period as opposed to the five (5) year period as described in Option 1 above.

As previously described herein, the Debtor would offer both options to the Class 9 Claimants with the Claimants choosing which option they desire. Failure to choose one of the two payment options will result in the Class 9 Claimants being treated as a Class 8 Unsecured Creditor and shall be paid consistent with the Class 8 Claimants.

10. Class 10 (Unimpaired) consists of the membership interest ("Equity Interest") of the Debtor which is held by the following individuals: (1) Earl Brantley – 7%; (2) Larry Williams – 25%; (3) Douglas Cowell – 15%; (4) Tavia Cowell – 15%; (5) Dale Missildine – 8%; (6) Timothy Bussell – 5%; (7) Stephen J. Mercer – 25%. All equity interests will be retained by the Debtor's equity security holders upon confirmation.

(b) Administrative Claims. Each holder of an Allowed Administrative Claim (except any such holder that agrees to different treatment) shall receive the Allowed Amount of such holder's Allowed Administrative Claim, in Cash, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, on the Effective Date; provided, however, that Allowed Administrative Claims representing (a) post-petition liabilities incurred in the ordinary course of business by the Debtor and (b) post-petition contractual liabilities arising under loans or advances to the Debtor, whether or not incurred in the ordinary course of business, shall be paid by the Debtor in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto. Administrative claims are estimated to be approximately $30,000.00 (after payment of any interim fees).

In the event that such claims are not paid in full on the Effective Date, such Administrative claims will be paid $2,500.00 per month for a period of twelve (12) months.

(c)    <u>Priority Tax Claims--Other than ad valorem real property (Class 3)</u>.

Each holder of an Allowed Priority Claim (except any such holder that agrees to different treatment) shall receive the Allowed Amount of such holder's Allowed Priority Claim, in Cash, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, on the Effective Date. The obligations under this Section with respect of any Allowed Priority Claim that is secured by a valid, perfected and enforceable Lien shall be collateralized by a continuation of the Lien underlying such Claim and such obligation shall be and become due and payable upon the sale or other disposition of the collateral therefore. This includes any sales tax claims. Except has provided for herein, the Debtor does not believe any amounts are owed.

**ARTICLE V**
**TREATMENT OF EXECUTORY CONTRACTS AND**
**UNEXPIRED LEASES AND RELEASE AND DISCHARGE**

5.1    <u>Executory Contracts and Unexpired Leases</u>:  All executory contracts or unexpired leases that have not been assumed and/or assigned by an Order of the Bankruptcy Court or that are not to be expressly assumed under the Debtor's Plan shall be deemed Rejected Contracts as of the Effective Date.    For instance, please see the treatment of the Class 9 Claimants above which seeks rejection of those executory contracts.

5.2    <u>Release and Discharge</u>:  The rights afforded to the holders of Claims by and in this Plan shall be in exchange for and in complete release, satisfaction, and discharge, to the fullest extent permitted by applicable law, of all claims of any nature whatsoever against the Debtor. This release and discharge shall be effective as of the Effective Date.

**ARTICLE VI**
**PRESENT OPERATION**

The Debtor is presently operating as a Debtor-in-Possession ("DIP") and proposes this Disclosure Statement and Plan to restructure its financial affairs and continue operating. The

Debtor is located at 2001 Clubhouse Drive, Plant City, Florida and owns the real estate and facilities.  More detailed information is set forth in the Debtor's "Bankruptcy Schedules" and "Case Management Summary" which are filed with the Bankruptcy Court and are a matter of record.

## ARTICLE VII
## THE REORGANIZED DEBTOR

Following confirmation, Stephen J. Mercer will continue to serve as the Debtor's Managing Member and General Manager.  In addition, Larry Williams, a member of the Debtor, will also continue to perform accounting services for the Debtor.  Messrs. Mercer and Williams, as members of the Debtor, will continue to receive compensation as set forth below.

In the event the Debtor meets all of its financial obligations under the Plan and, if profitable, the Debtor may increase the compensation of both Mr. Mercer and Mr. Williams to account for reasonable raises to any one of the members consistent with its reasonable business judgment and consistent with such compensation that exists in the Debtor's industry or market.

The Debtor has filed a Motion for Authority to Pay Insider Management Fees requesting the Court's authorization to continue to pay Mr. Mercer $52,000.00 per year, plus $404.00 per month for health insurance and $500.00 per month for vehicle reimbursement expenses, in exchange for his management services; and Court authorization to continue to pay Larry Williams $125.00 per week for his accounting services.

## ARTICLE VIII
## DEBTOR'S EFFORTS TO FACILITATE REORGANIZATION

The Debtor has filed a Chapter 11 in order to restructure its financial affairs.  By increasing the number of its members, pursuing other business expansion plans, and restructuring the Debtor's debt, the Debtor will be in a better position to reorganize.  A more detailed

discussion of the Debtor's efforts to facilitate reorganization is described in Section 2, pages 10-12.

## ARTICLE VIX
## LIQUIDATION ANALYSIS

A Chapter 11 plan cannot be confirmed unless the Bankruptcy Court finds that the plan is in the "best interests" of creditors and equity holders, taking into account the liquidation value of the debtor. In applying the "best interests" test of § 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court would ascertain the hypothetical recoveries in a Chapter 7 liquidation to secured creditors, priority claimants, general unsecured creditors and equity holders. These hypothetical Chapter 7 liquidation recoveries would then be compared to the distributions offered to each class of claims or interests under the proposed Chapter 11 plan to determine if the plan satisfies the "best interests" test as set forth in § 1129(a)(7) of the Bankruptcy Code. A liquidation analysis is attached hereto as Exhibit "A" and by reference incorporated herein.

Other Alternatives to the Plan. If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different Chapter 11 plan or convert the Bankruptcy Case to a Chapter 7.

THE DEBTOR BELIEVES THAT THE CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE TO THE CHAPTER 7 LIQUIDATION ALTERNATIVE BECAUSE THE PLAN SHOULD PROVIDE GREATER RECOVERIES THAN THOSE AVAILABLE IN A CHAPTER 7 LIQUIDATION.

## ARTICLE X
## INCOME AND EXPENSE STATEMENT SINCE FILING PETITION

See attached Exhibit "B".

**ARTICLE XI**
**PROJECTED INCOME AND EXPENSES FOR LIFE OF PLAN**

See attached Exhibit "C".


**ARTICLE XII**
**SUMMARY OF PLAN OF REORGANIZATION**

Since this is not a "mega" Chapter 11 case, the Debtor's Plan is short enough wherein a summary of the Plan of Reorganization would not be helpful in the opinion of the Debtor.

**ARTICLE XIII**
**MEANS OF EXECUTION OF THE PLAN/FUNDING OF PLAN**

The Debtor shall make payments under the Plan from the operations of the Debtor's business. Additionally, the Debtor shall utilize the Recovered Funds with respect to the Kagel Litigation, as described herein, to fund the Debtor's plan. For instance, a portion of the Recovered Funds shall be earmarked towards paying certain Plan obligations including up to four (4) months worth of monthly payments the Debtor is obligated to pay to Zions First National Bank upon Plan confirmation. The Debtor will not prepay the four (4) months worth of payments, but earmark and place in escrow the four (4) months worth of payments which will be released and paid as each monthly payment due to Zions comes due.

**ARTICLE XIV**
**EFFECTIVE DATE**

The Effective Date of the Plan shall be thirty (30) days after confirmation of the Plan. The Debtor shall continue adequate protection payments or payments approved by the Court until the Effective Date of the Plan.

## ARTICLE XV
## CRAM DOWN

If the Debtor does not initially obtain sufficient votes to approve the Plan of Reorganization, the Debtor will attempt to obtain a cram down of the Plan of Reorganization.

## ARTICLE XVI
## RETENTION OF LIENS

All secured creditors shall retain their liens on their respective collateral until their secured claims are paid in full. All notes, mortgages, security agreements shall remain in full force and effect except as modified by the Plan.

## ARTICLE XVII
## RETENTION OF JURISDICTION

The Bankruptcy Court will retain jurisdiction as provided for by the Bankruptcy Code and other applicable law. The Bankruptcy Court will retain Jurisdiction to determine all issues related to the Debtor's Plan including enforcement of any plan default.

## ARTICLE XVIII
## NO LIABILITY FOR TAX CLAIMS

Unless a taxing Governmental Authority has asserted a Claim against the Debtor before the Bar Date or Administrative Expense Claims Bar Date established therefore, no Claim of such Governmental Authority shall be allowed against the Debtor or the Reorganized Debtor or their respective members, officers or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtor, any of its affiliates, or any other person or entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

## ARTICLE XIX
## TAX CONSIDERATIONS

**A.     General**

A summary description of certain U.S. federal income tax consequences of the Plan is provided below.  The description of tax consequences below is for informational purposes only and is subject to significant uncertainties.  Only the principal consequences of the Plan for the Debtor and for the holders of Allowed Claims and Equity Interests who are entitled to vote to accept or reject the Plan are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan, and no tax opinion is being given in this Disclosure Statement.  No rulings or determinations of the IRS or any other taxing authorities have been obtained or sought with respect to the Plan, and the description below is not binding upon the IRS or such other authorities.

The following discussion of U.S. federal income tax consequences is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), regulations promulgated and proposed thereunder, and judicial decisions and administrative rulings and pronouncements of the IRS as in effect on the date hereof.  Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to Holders.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal tax consequences of the Plan to special classes of taxpayers (such as foreign entities, nonresident alien individuals, Pass-through entities such as partnerships and holders through such pass-through entities, S corporations, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment

companies, certain securities traders, broker-dealers and tax-exempt organizations). Furthermore, estate and gift tax issues are not addressed herein and tax consequences relating to the alternative minimum tax are generally not discussed herein.

No representations are made regarding the particular tax consequences of the Plan to any Holder of a Claim or Equity Interest. Each Holder of a claim or Equity Interest is strongly urged to consult its own tax advisor regarding the federal, state, local and foreign tax consequences of the transactions described herein and in the Plan.

**B.      Federal Income Tax Consequences to the Debtors.**

Generally, the discharge of a debt obligation by a debtor for an amount less than the adjusted issues price (in most cases, the amount the debtor received on incurring the obligation with certain adjustments) gives rise to cancellation of a debt ("COD") income, which must be included in the debtor's income. The Debtors should have COD income as a result of the Plan; the Debtors should, however, be able to utilize a special tax provision which excludes from taxable income debts discharged in a chapter 11 case. If debts are discharged in a chapter 11 case, however, certain tax attributes otherwise available must be reduced by the amount of COD income that is excludable from income. Tax attributes subject to reduction generally include net operating losses and net operating loss carryovers (collectively, "NOLs"). Any NOLs would be reduced (assuming the Debtors do not make an election pursuant to section 108(b)(5) of the Internal Revenue Code (title 26 of the United States Code) to first reduce the tax basis of depreciable property) to the extent of the COD income exclusions.

Federal income taxes generally must be satisfied before most other claims may be paid. To the extent the Debtors have taxable income after the Effective Date the Debtors may have NOLs to offset such income.

## C.     Federal Income Tax Consequences to Creditors and Interestholders

Creditors should generally recognize gain (or loss) to the extent the amount realized under the Plan (generally the amount of cash received) in respect of their Claims Exceeds (or is exceeded by) their respective tax bases in their Claims.  The tax treatment of holders of Claims and the character and mount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan will depend upon, amount other things, (i) the nature and origin of the Claim, (ii) the manner in which a Creditor acquired a Claim, (iii) the length of time a Claim has been held, (iv) whether the Claim was acquired at a discount, (v) whether the Creditor has taken a bad debt deduction in the current or prior years, (vi) whether the Creditor has previously included in income accrued but unpaid interest with respect to a Claim, (vii) the method of tax accounting of a Creditor; and (viii) whether a Claim is an installment obligation for U.S. federal income tax purposes.  Therefore, Creditors should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequence to such Creditors as a result thereof.

The tax treatment of a Creditor that receives distributions in different taxable years is uncertain.  If such a Creditor treats the transaction as closed in the taxable year that it first receives (or is deemed to have received) a distribution of cash and/or other property, it should recognize gain or loss for such tax year in an amount equal to the cash and the value of other property actually (and deemed) received in such tax year (other than that received in respect of accrued interest) with respect to its Claim (other than any portion of the Claim that is attributable to accrued interest) plus the estimated value of future distributions (if any) less its tax basis in its Claim (except to the extent its Claim is for accrued interest).  A Creditor should then subsequently recognize additional income or loss when additional property distributions are

actually received in an amount equal to the cash and/or value of such other property (other than that received in respect of accrued interest) less the Creditor's allocable tax basis in its Claim with respect to such subsequent distribution. A creditor may have to treat a portion of any such subsequent distribution as imputed interest recognizable as ordinary income in accordance with the Creditor's method of tax accounting. If instead the open transaction doctrine applies as a result of the value of the subsequent distributions that a Creditor may receive not being ascertainable on the Effective Date, such Creditor should not recognize gain (except to the extent that the value of the cash and/or other property already received exceeds such Creditor's adjusted tax basis in its Claim (other than any Claim for accrued interest)) or loss with respect to its Claim until it receives the final distribution thereon (which may not be until the final distribution date). It is the position of the IRS that the open transaction doctrine only applies in rare and extraordinary cases. Creditors are urged to consult their own tax advisors regarding the application of the open transaction doctrine and how it may apply to their particular situations, whether any gain recognition may be deferred under the installment method, whether any loss may be disallowed or deferred under the related party rules and the tax treatment of amounts that certain Creditors may be treated as paying to other Creditors.

Holders of Allowed Claims will be treated as receiving a payment of interest (in addition to any imputed interest as discussed in the preceding paragraph) includible in income in accordance with the Holder's method of accounting for tax purposes, to the extent that any Cash and/or other property received pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of Cash and/or other property should be attributable to accrued but unpaid interest is unclear. The Plan provides that such Cash and/or other property distributed pursuant to the Plan is attributable to accrued but unpaid

interest, if any, on such Allowed Claims. The extent to which the receipt of Cash and/or other property should be attributable to accrued but unpaid interest is unclear. The Plan provides that such Cash and/or other property distributed pursuant to the Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon. Each Creditor should consult its own tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any) and whether any such interest may be considered to be foreign source income. A Creditor generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

**D.** **Holders of Allowed Equity Interests**

The Holders of Allowed Equity Interests in the Debtors are urged to consult with their tax advisors with respect to the tax consequences under the Plan. The Holders of Allowed Equity Interests and their advisors may wish to consider, among any other relevant considerations, the extent to which the Holder of an Allowed Equity Interest may be entitled to a bed debt deduction or a worthless security loss in respect of the cancellation of its shares of the Debtors' common stock under the Plan.

**E.** **Holders of Disputed Claims**

Though not beyond doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that Cash is transferred to the Disputed Claims Reserve, but should recognize gain or loss in an amount equal to: (i) the amount of Cash and the fair market value of any other property actually distributed to such claimants (other than any amounts attributable to accrued and unpaid interest) less (ii) the adjusted tax basis of their Claims (other than for accrued and unpaid interest). Holders of Disputed Claims are urged to consult their own tax advisors

regarding the taxation of their Disputed Claims and the timing and amount of income or loss recognized relating to the Disputed Claims Reserve.

**F.      Information Reporting and Backup Withholding**

Certain payments, including payments of Allowed Claims pursuant to the Plan, are generally subject to information reporting by the payor to the IRS.  Moreover, such reportable payments are subject to backup withholding under certain circumstances.  Under the backup withholding rules, a Holder of a Claim may be subject to backup withholding at the applicable tax rate with respect to distributions or payments made pursuant to the Plan, unless the Holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury as to the correctness of its taxpayer identification number and certain other tax matters.  Backup withholding is not an additional tax.  Rather, the federal income tax liability of persons subject to backup withholding will be reduced by the amount of tax withheld.  If withholding results in an overpayment of federal income taxes, a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the IRS.

**G.      Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CREDITOR'S INDIVIDUAL**

CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS AND EQUITY
INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS
ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER
TAX CONSEQUENCES OF THE PLAN.

## ARTICLE XX
## AMOUNT OF CLAIMS

The amount of claims provided for in the Plan are for informational purposes only and
do not bind the parties. The amount of the claim to be paid to each creditor shall be determined
by the Debtor's Schedules and Proofs of Claim filed by each individual Creditor, if not objected
to or disallowed by Court Order.

Dated this ___ day of September, 2011.

VISIONS GOLF, LLC

By: _____
    Stephen J. Mercer
    Managing Member

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **DISCLOSURE STATEMENT** has been furnished either by the Court's CM/ECF system or by regular U. S. Mail to the **Office of the U.S. States Trustee**, 501 E. Polk St., Ste. 1200, Tampa, FL 33602; and **Visions Golf, LLC,** 2001 Clubhouse Drive, Plant City, Florida 33566, on this 1st day of September, 2011.

MORSE & GOMEZ, PA


/s/ Alberto F. Gomez, Jr.
ALBERTO F. GOMEZ, JR.
Florida Bar No. 784486
MORSE & GOMEZ, PA
119 South Dakota Avenue
Tampa, Florida 33606-1813
Telephone: (813) 301-1000
Facsimile: (813) 301-1001
Counsel for Debtor

Exhibit "A"

## Visions Golf, LLC
### Exhibit "A"
### SUMMARY OF ASSETS AND LIABILITIES

|  | LIQUIDATION VALUE | REORGANIZATION PLAN* |  |
|---|---|---|---|
| **Assets:** |  |  |  |
| Cash | $10,000 | $10,000 |  |
| Accounts Receivable (Collectable) | 20,000 | 32,671 |  |
| Settlement | - | 125,000 |  |
| Real Estate | 1,500,000 | 2,400,000 |  |
| Inventory | 1,000 | 8,425 |  |
| Office Furniture & Equipment | 100,000 | 546,000 |  |
| **Total Assets** | **$ 1,631,000** | **$ 3,122,096** |  |
|  |  |  |  |
| **Liabilities:** |  |  |  |
| Morse & Gomez, Attorneys at Law* | None | $ 30,000 |  |
| Accounting | None | 500 |  |
| Priority Claims-Zion's Bank | None | 2,327,025.03 | $15,895 monthly |
| Unsecured Priority Claims | None | 200,000 |  |
| Unsecured Claims | None | 125,000 |  |
| **Total Liabilities** | **$ -** | **$ 2,682,525** |  |
|  |  |  |  |
| **TOTAL LIABILITIES TO BE PAID:** | **None** | **$2,672,525** |  |

*Not including interim fees and costs billed and paid per court order.

Exhibit "B"

## SCHEDULE OF RECEIPTS AND DISBURSEMENTS
### FOR THE PERIOD BEGINNING 07/01/2011 _____ AND ENDING 07/31/2011 _____

Name of Debtor: Visions Golf, LLC

Case Number 8:11-bk-08840-KRM

Date of Petition: 05/09/2011

| | CURRENT MONTH | CUMULATIVE PETITION TO DATE |
|---|---|---|
| 1. FUNDS AT BEGINNING OF PERIOD | $79,914.08 (a) | $88,724.32 (b) |
| 2. RECEIPTS: | | |
| A. Cash Sales | $65,922.21 | $152,357.43 |
| Minus: Cash Refunds | (-) | |
| Net Cash Sales | $65,922.21 | $152,357.43 |
| B. Accounts Receivable | $17,299.77 | $116,556.73 |
| C. Other Receipts *(See MOR-3)* | $984.00 | $ 984.00 |
| (If you receive rental income, | | |
| you must attach a rent roll.) | | |
| 3. TOTAL RECEIPTS *(Lines 2A+2B+2C)* | $84,205.98 | $269,898.16 |
| 4. TOTAL FUNDS AVAILABLE FOR | | |
| OPERATIONS *(Line 1 + Line 3)* | $164,120.06 | $358,622.48 |
| | | |
| 5. DISBURSEMENTS | | |
| A. Advertising | $579.56 | $1921.44 |
| B. Bank Charges | $1323.24 | $2898.31 |
| C. Contract Labor | $0 | $557.50 |
| D. Fixed Asset Payments (not incl. in "N") | | |
| E. Insurance | $3208.47 | $10682.31 |
| F. Inventory Payments *(See Attach. 2)* | $1947.01 | $6178.06 |
| G. Leases | | $3932.30 |
| H. Manufacturing Supplies | $3354.52 | $4463.89 |
| I. Office Supplies | $430.34 | $1598.82 |
| J. Payroll - Net *(See Attachment 4B)* | $49587.21 | $71349.45 |
| K. Professional Fees (Accounting & Legal) | | |
| L. Rent | | |
| M. Repairs & Maintenance | $3596.15 | $11217.88 |
| N. Secured Creditor Payments *(See Attach. 2)* | $12411.55 | $22073.10 |
| O. Taxes Paid - Payroll *(See Attachment 4C)* | $7976.72 | $21436.09 |
| P. Taxes Paid - Sales & Use *(See Attachment 4C)* | $6521.47 | $19134.06 |
| Q. Taxes Paid - Other *(See Attachment 4C)* | $3151.45 | $ 3512.07 |
| R. Telephone | $845.78 | $2620.34 |
| S. Travel & Entertainment | | |
| Y. U.S. Trustee Quarterly Fees | $975.00 | $975.00 |
| U. Utilities | $13510.96 | $29266.32 |
| V. Vehicle Expenses | $550.00 | $1412.72 |
| W. Other Operating Expenses *(See MOR-3)* | $6033.33 | $21616.01 |
| 6. TOTAL DISBURSEMENTS *(Sum of 5A thru W)* | $118,756.00 | $313,258.48 |
| 7. ENDING BALANCE *(Line 4 Minus Line 6)* | $45,364.00 (c) | $45,364.00 (c) |

I declare under penalty of perjury that this statement and the accompanying documents and reports are true and correct to the best of my knowledge and belief.

This 19ᵗʰ day of AuguST, 2011.

_____
(Signature)

(a)This number is carried forward from last month's report. For the first report only, this number will be the balance as of the petition date.

(b)This figure will not change from month to month. It is always the amount of funds on hand as of the date of the petition.

(c)These two amounts will always be the same if form is completed correctly.

Exhibit "B"

Exhibit "C"

**Visions Golf, LLC**
**Cash Flow Statement- First Year -Twelve Months**

| | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Exhibit "C" Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | 1st Year Year End |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | $107,000 | $114,000 | $202,000 | $182,000 | $184,000 | $220,000 | $188,000 | $112,000 | $119,000 | $102,000 | $88,000 | $120,000 | $1,738,000 |
| Settlement-$125,000 | $31,250 | $31,250 | $31,250 | $31,250 | | | | | | | | | |
| **Expenses** | | | | | | | | | | | | | |
| Advertising & Marketing | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 18,000 |
| Alarm Monitoring | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 865 | 65 | 65 | 65 | 65 | 1,580 |
| Auto | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Cost of goods sold | 9,630 | 10,260 | 18,180 | 16,380 | 16,560 | 19,800 | 16,920 | 10,080 | 10,710 | 9,180 | 7,920 | 10,800 | 156,420 |
| Bank Service Charges | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 900 |
| Accounting Services | | | | | 750 | | | | | | | | 750 |
| Capital Repairs & Maintenance* | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Cart Lease | 3,576 | 5,576 | 5,576 | 5,576 | 5,576 | 11,000 | 5,576 | 3,576 | 3,576 | 3,576 | 3,576 | 3,576 | 60,336 |
| Cell Phone | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| Chemicals/Fertilizers/Sand/Seed | 10,000 | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 70,000 |
| Copier Supplies | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 900 |
| Cable TV | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Insurance - Property | 2,013 | 2,013 | 2,013 | 2,013 | 1,677 | 1,677 | 3,000 | 436 | 436 | 436 | 5,366 | 2,013 | 23,093 |
| Insurance - Workers Comp | 927 | 927 | 927 | 927 | 927 | 927 | 100 | 100 | 100 | 100 | 100 | 927 | 11,124 |
| Insurance - Employee Health | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 1,854 | | 850 | 10,200 |
| Insurance - General Liability | 1,282 | 1,282 | 1,282 | 1,282 | 1,282 | | | | 5,000 | 850 | | 1,400 | 12,810 |
| Fuel | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 84,000 |
| Legal Fees/Costs | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Licenses and Permits | | | | 609 | | | | | 275 | | 1,160 | 2,070 | 4,114 |
| Merchant Card Fees | 1,177 | 1,254 | 2,222 | 2,002 | 2,024 | 2,420 | 2,068 | 1,232 | 1,309 | 1,122 | 968 | 1,320 | 19,118 |
| Office Supplies | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Payroll | 48,000 | 48,000 | 72,000 | 48,000 | 48,000 | 48,000 | 48,000 | 48,000 | 48,000 | 72,000 | 48,000 | 48,000 | 624,000 |
| Postage & Shipping | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Sales Tax Expense | 7,980 | 7,980 | 14,140 | 12,740 | 12,880 | 14,100 | 11,500 | 7,840 | 8,330 | 7,140 | 6,160 | 8,400 | 118,500 |
| Repairs & Maintenance | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 42,000 |
| Real Estate Tax Escrow | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 32,844 |
| Taxes-Tangible Per. Prop. Escrow | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 3,672 |
| Electricity | 8,000 | 9,500 | 8,000 | 8,000 | 7,000 | 7,000 | 8,000 | 9,000 | 10,000 | 11,000 | 8,000 | 8,000 | 101,500 |
| Telephone Expense | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 7,800 |
| Water/Garbage | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 25,200 |
| **Proposed Plan Payments:** | | | | | | | | | | | | | |
| Class 1-Suntrust Bank P&I | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 7,116 |
| Class 2-Zion's Bank P & I | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 190,740 |
| Class 3-Hills Co./2010 R/E Tax | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 18,756 |
| Class 4-De Lage Laden Financial | 107 | 107 | 107 | 107 | 107 | 107 | 107 | 107 | 107 | 107 | 107 | 107 | 1,284 |
| Class 5-Western Finance | | 961 | 961 | 961 | 961 | 961 | 961 | 961 | 961 | 961 | 961 | 961 | 9,610 |
| Class 6-IRS/2009 941 Taxes | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 31,368 |
| Class 7-FDOR '07-'10 Sales Tax | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 7,200 |
| Class 8-General Unsecured Creditors | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Class 9-Lifetime Members | | | | | | | | | | | | | |
| Administrative Claims | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| **Total Estimated Expense** | $139,775 | $144,472 | $177,981 | $151,170 | $150,317 | $158,565 | $149,432 | $135,532 | $141,277 | $159,949 | $135,718 | $140,147 | $1,764,335 |
| **Net Cash Flow** | ($1,525) | $778 | $55,269 | $62,080 | $33,683 | $61,435 | $38,568 | ($23,532) | ($22,277) | ($57,949) | ($47,718) | ($20,147) | $78,665 |
| **Cummulative Cash Flow- In Bank** | $18,475 | $19,253 | $74,522 | $136,602 | $170,285 | $231,720 | $270,288 | $246,756 | $224,479 | $166,530 | $118,812 | $98,665 | |

* Includes Capital Repairs and/or Replacement of golf course equipment, furniture, fixtures, air condition equipment, food & beverage equipment, signage and related equipment.

**Visions Golf, LLC**
**Cash Flow Statement- Second Year -Twelve Months**
Exhibit "C"

| | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | 2nd Year Year End |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | $112,350 | $119,700 | $212,100 | $191,100 | $193,200 | $231,000 | $197,400 | $117,600 | $124,950 | $107,100 | $92,400 | $126,000 | $1,824,900 |
| Settlement-$125,000 | | | | | | | | | | | | | |
| **Expenses** | | | | | | | | | | | | | |
| Advertising & Marketing | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 24,000 |
| Alarm Monitoring | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 865 | 65 | 65 | 65 | 65 | 1,580 |
| Auto | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Cost of goods sold | 10,112 | 10,773 | 19,089 | 17,199 | 17,388 | 20,790 | 17,766 | 10,584 | 11,246 | 9,639 | 8,316 | 11,340 | 164,241 |
| Bank Service Charges | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 948 |
| Accounting Services | | | | | | | | | | | | | 800 |
| Capital Repairs & Maintenance* | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 18,000 |
| Cart Lease | 3,576 | 5,576 | 5,576 | 5,576 | 5,576 | 11,000 | 5,576 | 3,576 | 3,576 | 3,576 | 3,576 | 3,576 | 60,336 |
| Cell Phone | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| Chemicals/Fertilizers/Sand/Seed | 10,500 | 10,500 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 73,500 |
| Copier Supplies | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 960 |
| Cable TV | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Insurance - Property | 2,013 | 2,013 | 2,013 | 2,013 | 1,677 | 1,677 | 3,000 | 100 | 100 | 436 | 5,366 | 2,013 | 23,093 |
| Insurance - Workers Comp | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 11,124 |
| Insurance - Employee Health | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 10,800 |
| Insurance- General Liability | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | | | | | | | 1,500 | 13,750 |
| Fuel | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 88,200 |
| Legal Fees/Costs | 300 | 300 | 300 | 300 | 300 | 300 | 306 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| Licenses and Permits | | | 609 | | | | | | 275 | | 1,160 | 2,070 | 4,414 |
| Merchant Card Fees | 1,236 | 1,317 | 2,333 | 2,102 | 2,125 | 2,541 | 2,171 | 1,294 | 1,374 | 1,178 | 1,016 | 1,386 | 20,074 |
| Office Supplies | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 6,300 |
| Payroll | 50,000 | 50,000 | 75,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 75,000 | 50,000 | 50,000 | 650,000 |
| Postage & Shipping | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 1,320 |
| Sales Tax Expense | 7,865 | 8,379 | 14,847 | 13,377 | 13,524 | 14,538 | 10,451 | 8,232 | 8,747 | 7,497 | 6,468 | 8,820 | 122,744 |
| Repairs & Maintenance | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 3,700 | 44,400 |
| Real Estate Tax Escrow | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 32,844 |
| Taxes- Tangible Per. Prop. Escrow | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 3,672 |
| Electricity | 6,500 | 7,500 | 6,500 | 6,500 | 6,000 | 6,000 | 6,500 | 7,500 | 8,000 | 9,000 | 6,500 | 6,500 | 83,000 |
| Telephone Expense | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 7,800 |
| Water/Garbage | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 26,400 |
| **Proposed Plan Payments:** | | | | | | | | | | | | | |
| Class 1-Suntrust Bank P&I | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 7,116 |
| Class 2-Zion's Bank P & I | 13,295 | 13,295 | 13,295 | 13,295 | 13,295 | 13,295 | 13,295 | 13,295 | 13,295 | 13,295 | 13,295 | 13,296 | 159,540 |
| Class 3-Hills Co./2010 R/E Tax | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 18,756 |
| Class 4-De Lage Laden Financial | 107 | 107 | 107 | 107 | 107 | 107 | 107 | 107 | 107 | 107 | 107 | 107 | 1,284 |
| Class 5-Western Finance | 961 | 961 | | | | | | | | | | | 1,922 |
| Class 6-IRS/2009 941 Taxes | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 31,388 |
| Class 7-FDOR '07-'10 Sales Tax | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 7,200 |
| Class 8-General Unsecured Creditors | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| Class 9-Lifetime Members | | | | | | | | | | | | | |
| Administrative Claims | | | | | | | | | | | | | |
| **Total Estimated Expense** | $143,213 | $147,470 | $181,059 | $153,077 | $151,991 | $160,847 | $150,565 | $136,723 | $142,277 | $161,554 | $136,703 | $141,506 | $1,806,986 |
| **Net Cash Flow** | $(30,863) | $(27,770) | $31,041 | $38,023 | $41,209 | $70,153 | $46,835 | $(19,123) | $(17,327) | $(54,454) | $(44,303) | $(15,506) | $17,914 |
| **Cummulative Cash Flow- In Bank** | $67,802 | $40,032 | $71,073 | $109,096 | $150,305 | $220,458 | $267,293 | $248,170 | $230,843 | $176,389 | $132,085 | $116,579 | $116,579 |

\* Includes: Capital Repairs and/or Replacement of golf course equipment, furniture, fixtures, air condition equipment, food & beverage equipment, signage and related equipment.

Page 2 of 5

## Visions Golf, LLC
### Cash Flow Statement- Third Year -Twelve Months
### Exhibit "C"

| | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | 3rd Year Year End |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | |
| Settlement-$125,000 | $117,968 | $125,685 | $222,705 | $200,655 | $202,860 | $242,550 | $207,270 | $123,480 | $131,198 | $112,455 | $97,020 | $132,300 | $1,916,145 |
| **Expenses** | | | | | | | | | | | | | |
| Advertising & Marketing | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 42,000 |
| Alarm Monitoring | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 865 | 65 | 65 | 65 | 65 | 1,580 |
| Auto | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Cost of goods sold | 10,617 | 11,312 | 20,043 | 18,059 | 18,257 | 21,830 | 18,654 | 11,113 | 11,808 | 10,121 | 8,732 | 11,967 | 172,453 |
| Bank Service Charges | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 1,008 |
| Accounting Services | | | | | | | | | | | | | 850 |
| Capital Repairs & Maintenance* | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Car Lease | 5,028 | 5,028 | 5,028 | 5,028 | 5,028 | 5,028 | 5,028 | 5,028 | 5,028 | 5,028 | 5,028 | 5,028 | 60,336 |
| Cell Phone | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| Chemicals/Fertilizers/Sand/Seed | 11,050 | 11,050 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 5,600 | 78,100 |
| Copier Supplies | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 1,020 |
| Cable TV | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Insurance - Property | 2,013 | 2,013 | 2,013 | 2,013 | 1,677 | 1,677 | 3,000 | 436 | 436 | 436 | 5,366 | 2,013 | 23,093 |
| Insurance - Workers Comp | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 1,854 | 100 | 100 | 11,124 |
| Insurance - Employee Health | 928 | 928 | 928 | 928 | 928 | 928 | 928 | 928 | 928 | 928 | 928 | 928 | 11,136 |
| Insurance- General Liability | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 14,700 |
| Fuel | 7,718 | 7,718 | 7,718 | 7,718 | 7,718 | 7,718 | 7,718 | 7,718 | 7,718 | 7,718 | 7,718 | 7,718 | 92,616 |
| Legal Fees/Costs | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Licenses and Permits | | | 609 | | | | | | 275 | | | | 4,114 |
| Merchant Card Fees | 1,298 | 1,383 | 2,450 | 2,207 | 2,231 | 2,668 | 2,280 | 1,358 | 1,443 | 1,237 | 1,067 | 1,455 | 21,078 |
| Office Supplies | 560 | 560 | 560 | 560 | 560 | 560 | 560 | 560 | 560 | 560 | 560 | 560 | 6,720 |
| Payroll | 52,000 | 52,000 | 78,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 78,000 | 52,000 | 52,000 | 676,000 |
| Postage & Shipping | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 1,440 |
| Sales Tax Expense | 8,258 | 8,798 | 15,589 | 14,046 | 14,200 | 16,979 | 14,509 | 8,644 | 9,184 | 7,872 | 6,791 | 9,261 | 134,130 |
| Repairs & Maintenance | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 3,900 | 46,800 |
| Real Estate Tax Escrow | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 32,844 |
| Taxes-Tangible Per. Prop. Escrow | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 3,672 |
| Electricity | 6,500 | 7,500 | 6,500 | 6,500 | 6,000 | 6,000 | 6,500 | 7,500 | 8,000 | 9,000 | 6,500 | 6,500 | 83,000 |
| Telephone Expense | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 7,800 |
| Water/Garbage | 2,300 | 2,300 | 2,300 | 2,300 | 2,300 | 2,300 | 2,300 | 2,300 | 2,300 | 2,300 | 2,300 | 2,300 | 27,600 |
| **Proposed Plan Payments:** | | | | | | | | | | | | | |
| Class 1-Suntrust Bank P&I | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 7,116 |
| Class 2-Zion's Bank P & I | 13,295 | 13,295 | 13,295 | 13,295 | 13,295 | 13,295 | 13,295 | 13,295 | 13,295 | 13,295 | 13,295 | 13,295 | 159,540 |
| Class 3-Hills Co./2010 R/E Tax | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 18,756 |
| Class 4-De Lage Laden Financial | 107 | 107 | 107 | 107 | 107 | 107 | | | | | | | 642 |
| Class 5-Western Finance | | | | | | | | | | | | | - |
| Class 6-IRS/2009 941 Taxes | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 31,368 |
| Class 7-FDOR '07-'10 Sales Tax | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 7,200 |
| Class 8-General Unsecured Creditors | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 84,000 |
| Class 9-Lifetime Members | | | | | | | | | | | | | |
| Administrative Claims | | | | | | | | | | | | | |
| **Total Estimated Expense** | $149,813 | $154,133 | $190,274 | $161,112 | $160,044 | $170,755 | $161,864 | $143,922 | $149,890 | $169,664 | $143,687 | $148,877 | $1,904,036 |
| **Net Cash Flow** | $(31,846) | $(28,448) | $32,431 | $39,543 | $42,816 | $71,795 | $45,406 | $(20,442) | $(18,692) | $(57,209) | $(46,667) | $(16,577) | $12,109 |
| **Cummulative Cash Flow- In Bank** | $84,733 | $56,285 | $88,716 | $128,259 | $171,075 | $242,870 | $288,276 | $267,834 | $249,142 | $191,933 | $145,266 | $128,688 | |

* Includes: Capital Repairs and/or Replacement of golf course equipment, furniture, fixtures, air condition equipment, food & beverage equipment, signage and related equipment.

## Visions Golf, LLC
### Cash Flow Statement- Fourth Year -Twelve Months
### Exhibit "C"

| | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | 4th Year Year End |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | $123,866 | $131,969 | $233,840 | $210,688 | $213,003 | $254,678 | $217,634 | $129,654 | $137,757 | $118,078 | $101,871 | $138,915 | $ 2,011,952 |
| Settlement-$125,000 | | | | | | | | | | | | | |
| **Expenses** | | | | | | | | | | | | | |
| Advertising & Marketing | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 48,000 |
| Alarm Monitoring | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 865 | 65 | 65 | 65 | 65 | 1,580 |
| Auto | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Cost of goods sold | 11,148 | 11,877 | 21,046 | 18,862 | 19,170 | 22,921 | 19,587 | 11,669 | 12,398 | 10,627 | 9,168 | 12,502 | 181,076 |
| Bank Service Charges | 89 | 89 | 89 | 89 | 89 | 89 | 89 | 89 | 89 | 89 | 89 | 89 | 1,068 |
| Accounting Services | | | | | | | 900 | | | | | | 900 |
| Capital Repairs & Maintenance* | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Cart Lease | 3,576 | 5,576 | 5,576 | 5,576 | 5,576 | 11,000 | 5,576 | 3,576 | 3,576 | 3,576 | 3,576 | 3,576 | 60,336 |
| Cell Phone | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| Chemicals/Fertilizers/Sand/Seed | 11,600 | 11,600 | 5,900 | 5,900 | 5,900 | 5,900 | 5,900 | 5,900 | 5,900 | 5,900 | 5,900 | 5,900 | 82,200 |
| Copier Supplies | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 1,080 |
| Cable TV | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Insurance - Property | 2,013 | 2,013 | 2,013 | 2,013 | 1,677 | 1,677 | 3,000 | 436 | 436 | 436 | 5,366 | 2,013 | 23,093 |
| Insurance - Workers Comp | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 11,124 |
| Insurance - Employee Health | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Insurance- General Liability | 1,600 | 1,800 | 1,600 | 1,800 | 1,600 | 1,600 | | | | | | 1,700 | 15,600 |
| Fuel | 8,103 | 8,103 | 8,103 | 8,103 | 8,103 | 8,103 | 8,103 | 8,103 | 8,103 | 8,103 | 8,103 | 8,103 | 97,236 |
| Legal Fees/Costs | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Licenses and Permits | | | | 609 | | | | | 275 | | 1,160 | 2,070 | 4,114 |
| Merchant Card Fees | 1,363 | 1,452 | 2,572 | 2,318 | 2,343 | 2,801 | 2,394 | 1,426 | 1,515 | 1,299 | 1,121 | 1,528 | 22,131 |
| Office Supplies | 590 | 590 | 590 | 590 | 590 | 590 | 590 | 590 | 590 | 590 | 590 | 590 | 7,080 |
| Payroll | 54,000 | 54,000 | 81,000 | 54,000 | 54,000 | 54,000 | 54,000 | 54,000 | 54,000 | 81,000 | 54,000 | 54,000 | 702,000 |
| Postage & Shipping | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 1,560 |
| Sales Tax Expense | 8,671 | 9,238 | 16,369 | 14,748 | 14,910 | 17,827 | 15,234 | 9,076 | 9,643 | 8,265 | 7,131 | 9,724 | 140,837 |
| Repairs & Maintenance | 4,100 | 4,100 | 4,100 | 4,100 | 4,100 | 4,100 | 4,100 | 4,100 | 4,100 | 4,100 | 4,100 | 4,100 | 49,200 |
| Real Estate Tax Expense | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 32,844 |
| Taxes-Tangible Per. Prop. Escrow | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 3,672 |
| Electricity | 6,500 | 7,500 | 6,500 | 6,500 | 6,000 | 6,000 | 6,500 | 7,500 | 8,000 | 9,000 | 6,500 | 6,500 | 83,000 |
| Telephone Expense | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 7,800 |
| Water/Garbage | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 28,800 |
| **Proposed Plan Payments:** | | | | | | | | | | | | | |
| Class 1-Suntrust Bank P&I | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 7,116 |
| Class 2-Zion's Bank P & I | 14,500 | 14,500 | 14,500 | 14,500 | 14,500 | 14,500 | 14,500 | 14,500 | 14,500 | 14,500 | 14,500 | 14,500 | 174,000 |
| Class 3-Hills Co./2010 R/E Tax | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 18,756 |
| Class 4-De Lage Laden Financial | | | | | | | | | | | | | - |
| Class 5-Western Finance | | | | | | | | | | | | | |
| Class 6-IRS/2009 941 Taxes | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 2,614 | 31,368 |
| Class 7-FDOR '07-'10 Sales Tax | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 7,200 |
| Class 8-General Unsecured Creditors | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 96,000 |
| Class 9-Lifetime Members | | | | | | | | | | | | | |
| Administrative Claims | | | | | | | | | | | | | |
| **Total Estimated Expense** | $157,377 | $161,763 | $199,483 | $169,113 | $168,084 | $179,034 | $169,998 | $151,290 | $157,624 | $177,937 | $150,829 | $155,420 | $1,998,971 |
| **Net Cash Flow** | $(33,511) | $(29,793) | $34,358 | $41,555 | $44,919 | $75,644 | $47,635 | $(21,636) | $(19,866) | $(59,860) | $(48,958) | $(17,505) | $12,981 |
| **Cumulative Cash Flow- In Bank** | $95,177 | $65,384 | $99,741 | $141,296 | $186,216 | $261,859 | $309,495 | $287,859 | $267,993 | $208,133 | $159,175 | $141,670 | $12,981 |

*Includes Capital Repairs and/or Replacement of golf course equipment, furniture, fixtures, air conditioner equipment, food & beverage equipment, signage and related equipment.

## Visions Golf, LLC
### Cash Flow Statement- Fifth Year -Twelve Months
### Exhibit "C"

| | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | 5th Year Year End |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | |
| Settlement-$125,000 | $130,059 | $138,568 | $245,532 | $221,222 | $223,653 | $267,411 | $228,515 | $136,137 | $144,645 | $123,982 | $106,965 | $145,861 | $ 2,112,550 |
| **Expenses** | | | | | | | | | | | | | |
| Advertising & Marketing | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 54,000 |
| Alarm Monitoring | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 865 | 65 | 65 | 65 | 65 | 1,580 |
| Auto | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Cost of goods sold | 11,705 | 12,471 | 22,098 | 19,910 | 20,129 | 24,067 | 20,566 | 12,252 | 13,018 | 11,158 | 9,627 | 13,127 | 190,129 |
| Bank Service Charges | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 1,128 |
| Accounting Services | | | | | | | | | | | | | 950 |
| Capital Repairs & Maintenance* | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| Cart Lease | 3,576 | 5,576 | 5,576 | 5,576 | 5,576 | 11,000 | 5,576 | 3,576 | 3,576 | 3,576 | 3,576 | 3,576 | 60,336 |
| Cell Phone | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| Chemicals/Fertilizers/Sand/Seed | 12,000 | 12,000 | 6,200 | 6,200 | 6,200 | 6,200 | 6,200 | 6,200 | 6,200 | 6,200 | 6,200 | 6,200 | 86,000 |
| Copier Supplies | 95 | 95 | 95 | 95 | 95 | 95 | 95 | 95 | 95 | 95 | 95 | 95 | 1,140 |
| Cable TV | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Insurance - Property | 2,013 | 2,013 | 2,013 | 2,013 | 1,677 | 1,677 | 3,000 | 436 | 95 | 436 | 5,366 | 2,013 | 23,093 |
| Insurance - Workers Comp | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 927 | 100 | 100 | 927 | 927 | 11,124 |
| Insurance - Employee Health | 1,023 | 1,023 | 1,023 | 1,023 | 1,023 | 1,023 | 1,075 | 436 | 436 | 1,854 | 927 | 1,075 | 12,588 |
| Insurance- General Liability | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,023 | 1,075 | 1,075 | 1,075 | 1,075 | 1,075 | 1,800 | 16,500 |
| Fuel | 8,509 | 8,509 | 8,509 | 8,509 | 8,509 | 8,509 | 8,509 | 8,509 | 8,509 | 8,509 | 8,509 | 8,509 | 102,108 |
| Legal Fees/Costs | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Licenses and Permits | | | 609 | 609 | | | | | 275 | | 1,160 | 2,070 | 4,114 |
| Merchant Card Fees | 1,431 | 1,524 | 2,701 | 2,433 | 2,460 | 2,942 | 2,514 | 1,498 | 1,591 | 1,364 | 1,177 | 1,604 | 23,238 |
| Office Supplies | 620 | 620 | 620 | 620 | 620 | 620 | 620 | 620 | 620 | 620 | 620 | 620 | 7,440 |
| Payroll | 56,000 | 56,000 | 84,000 | 56,000 | 56,000 | 56,000 | 56,000 | 56,000 | 56,000 | 84,000 | 56,000 | 56,000 | 728,000 |
| Postage & Shipping | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 1,680 |
| Sales Tax Expense | 9,104 | 9,700 | 17,187 | 15,496 | 15,656 | 18,719 | 15,996 | 9,530 | 10,125 | 8,679 | 7,488 | 10,210 | 147,878 |
| Repairs & Maintenance | 4,300 | 4,300 | 4,300 | 4,300 | 4,300 | 4,300 | 4,300 | 4,300 | 4,300 | 4,300 | 4,300 | 4,300 | 51,600 |
| Real Estate Tax Escrow | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 2,737 | 32,844 |
| Taxes-Tangible Per. Prop. Escrow | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 306 | 3,672 |
| Electricity | 6,500 | 7,500 | 6,500 | 6,500 | 6,000 | 6,000 | 6,500 | 7,500 | 8,000 | 9,000 | 6,500 | 6,500 | 83,000 |
| Telephone Expense | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 650 | 7,800 |
| Water/Garbage | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 28,800 |
| **Proposed Plan Payments:** | | | | | | | | | | | | | |
| Class 1-Suntrust Bank P&I | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 593 | 7,116 |
| Class 2-Zion's Bank P & I | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 15,895 | 190,740 |
| Class 3-Hills Co./2010 R/E Tax | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 1,563 | 18,756 |
| Class 4-De Lage Landen Financial | | | | | | | | | | | | | |
| Class 5-Western Finance | | | | | | | | | | | | | |
| Class 6-IRS/2009 941 Taxes | | | | | | | | | | | | | |
| Class 7-FDOR '07-'10 Sales Tax | | | | | | | | | | | | | |
| Class 8-General Unsecured Creditors | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 7,200 |
| Class 9-Lifetime Members | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 138,000 |
| Administrative Claims | | | | | | | | | | | | | |
| **Total Estimated Expense** | $164,896 | $169,351 | $208,842 | $177,294 | $176,265 | $187,471 | $178,221 | $158,710 | $165,413 | $186,259 | $158,012 | $164,020 | $2,094,755 |
| Net Cash Flow | $ (34,837) | $ (30,783) | $ 36,690 | $ 43,928 | $ 47,388 | $ 79,940 | $ 50,294 | $ (22,574) | $ (20,768) | $ (62,277) | $ (51,047) | $ (18,159) | $ 17,795 |
| Cumulative Cash Flow- In Bank | $ 106,833 | $ 76,049 | $ 112,740 | $ 155,668 | $ 204,056 | $ 283,996 | $ 334,290 | $ 311,717 | $ 290,949 | $ 228,671 | $ 177,624 | $ 159,465 | |

* Includes: Capital Repairs and/or Replacement of golf course equipment, furniture, fixtures, air condition equipment, food & beverage equipment, signage and related equipment.